Good morning. Good morning, Your Honor, and may it please the Court. Jessica Ellsworth on behalf of Carnival PLC. This case involves the meaning of the word sold in a settlement agreement from an antitrust class action lawsuit involving fuel surcharge price fixing by the defendant airlines. The settlement agreement makes anyone to whom the airlines sold qualifying tickets a member of the settlement class. The parties don't dispute that the word sold is unambiguous. They just dispute what sold means. In Carnival's view, the meaning of sold is its ordinary dictionary definition. Party A pays money to Party B, and in return for paying that sales price, Party A obtains a good or service. That is exactly what Carnival did in connection with the plane tickets that are at issue in this appeal. It paid money to the airlines, and it received the plane tickets in return. The district court found that at ER-5 when it stated that it was – there was no dispute that Carnival remitted money to the airlines and received the tickets in exchange. British Airways' attorney even told the district court that the tickets were, quote, sold in the first instance to Carnival. How is what you're describing any different from what a travel agent does? We think it's quite different. And the key difference in what Carnival – in Carnival's obligation here that makes it different from an ordinary travel agent is that here the payment obligation, the financial transaction for the tickets only involved Carnival and the airline. Carnival is the only party that the airlines could pursue if payment was not made. The individuals – Does that apply to the surcharge, too? That does apply to the surcharge as well. My impression was Judge Breyer said that if the ticket isn't used, the – they may have had to pay for the ticket, but they don't have to pay for the surcharge. Well, I want to be clear. The tickets that were not used, tickets that were canceled or tickets that were not used for some other reason are not at issue. The only tickets at issue are ones that actually were used, and those are the tickets – every ticket that was used had a surcharge assessed on it, and that surcharge was, in fact, paid by Carnival to the airlines. There are a number of factors that I think – a number of facts that make very clear Carnival was the purchasing party here. One is, as I just mentioned, the financial transaction. The only payment for this airline ticket that is in the record is a payment that the evidence showed was that there was a payment from Carnival to the airlines for that ticket. The only party who knew the price of the ticket besides the airlines was Carnival. The cruise passengers had no knowledge of any ticket price, just as they had no financial obligation to pay that price. The passengers who purchased these all-inclusive packages – and this is package with a capital P. It's a defined term under U.K. law that involves this type of airfare plus all-inclusive – excuse me, all-inclusive trip. The passengers were purchasing a bundle. That bundle consisted of all of the inputs that Carnival needed to acquire. It included – Is there any evidence in the record as to whether Carnival passed on the complete price of the ticket to the passenger or whether it ever ate part of that price? Or, indeed, is there any evidence that Carnival ever made a profit when sold with respect to the ticket? In other words, put a – actually calculated a profit on the ticket? There is no evidence in the record of what price Carnival included when it calculated the price for the package. And, in fact, the contracts that Carnival had with the airlines precluded Carnival from making that information available to the cruise ship passengers. That was considered confidential information that Carnival was not permitted to disclose. There's also nothing in the record that shows Carnival made a profit or what that profit was. And there's nothing in the record that shows any increase in the bundled package price that Carnival – there's nothing that shows Carnival increased the price of the package every time the defendants increased the fuel surcharge by 5 pounds. There's no corresponding increase by Carnival in the price of the package. The airlines had no knowledge and no say over what Carnival set the price at for the package, and they had no ability to control whether Carnival made a profit, didn't make a profit, or included the full fuel surcharge in the – in the price that it set. When the district court had this case under advisement with respect to the settlement decree and whether he ought – Judge Breyer should have approved or not approved the settlement decree, was this matter ever discussed with him? The question of whether an entity like Carnival would be a member of the settlement class? With respect to tickets other than its crew tickets. No, I'm not aware that that ever came up. This issue was never discussed by anybody, apparently, before Judge Breyer, before he approved the settlement. I do not believe that it was discussed at any point before the settlement. And was Carnival party to all of those discussions? Carnival was not one of the named class representatives, so it was not involved in the discussions between class counsel and the airlines that resulted in the settlement. It received notice of the settlement agreement once the settlement was reached. In order to afford. That's correct. The district court relied on a number of facts in reaching its decision that we think are entirely irrelevant to the question of a sale. A sale involves a payment and a payment obligation. The district court focused on things like the fact a passenger's name could not be changed on a ticket once it was issued. If I go and purchase a ticket from British Airways that is indisputably my ticket, I can't change what name it's on either. The name on the ticket and the inability to change it is one of the characteristics of airline tickets because they are not fungible goods. It is not an indicator of who purchased the ticket. The district court also focused on the fact that Carnival could release certain seats that it did not need to use. That, again, is irrelevant to who purchased the tickets that Carnival did, in fact, need and did, in fact, use for its all-inclusive cruise passengers. Carnival may have negotiated contracts that enabled it to avoid having excess inventory of airline tickets so that it could release reservations it didn't need. But the reservations that it did need to purchase and the tickets that it did need to issue, it did, and it paid the fuel surcharge for those. You had to pay for tickets, or rather, you had to pay for space allocated that you did not ticket. Is that correct? There was a time period during which Carnival could release with no fine, no penalty tickets. And once that time period had passed, there was a penalty or a fee. Was that penalty the price of those tickets, or was it a fixed, just a fixed? It was a fixed amount, and I believe it was less, a lesser price. And it didn't include the fuel surcharge. Again, none of those tickets are the ones at issue. The only ones at issue are the ones that were, in fact, sold and a passenger, in fact, flew on. Now, did I read your brief correctly? You do not believe that your passengers who purchased the package are actually members of the class? That's correct. We believe that they purchased a package from Carnival that included, among other things, the airfare, the food at the salad bar, the use of deck chairs. That statement was made in the context of, well, if you lose, they don't get anything anyway. Is that your view? Our view is that they are not members of the settlement class. And so if Carnival is able to recuperate, recoup part of the cost of the airfare, just as if Carnival is able to negotiate a better deal on the price of food or a better price for fuel, that's. If you do not prevail here, what happens to the money? My understanding of the way the settlement agreement worked was that any funds that were not claimed by claimants is returned to the airlines. So it's in the airlines' interest to have the class, the number of members of the class be as small as possible because the excess funds revert to the airlines, whereas So the airlines would prefer just to have the 2,000 tickets, the 2,000 individuals who sought to be class members be included rather than Carnival's 116,000. Now, the complaint in the case alleged violations of the United States Sherman Act. It also alleged violations of European law. Am I correct? That's correct. Original jurisdiction was the Sherman Act and then the others. Is settlement agreement purported to settle all of the claims in the complaint? Is that correct? That's correct, Your Honor. The district court focused, in addition to the other things we're talking about, on the fact that Carnival did not purchase the tickets, quote, for itself. And again, the fact that the tickets were not issued in Carnival's name. There is nothing in the definition of class in the approved settlement agreement that requires that the purchaser of the tickets intend to use them, the ticket themselves, or that they have their name on the ticket. If I purchased a ticket for my parents to fly from London to visit me here in San Francisco, I would, in fact, still be a member of the class in Carnival's view. In the airlines' view, it's unclear what would happen with that ticket because I don't have my name that was on the ticket. We think that that fact, among others, shows that the airlines' view of the word sold is simply not consistent with an ordinary understanding of what a sale is and when it occurs. Let me ask you a question. This may be neither here nor there, but it's been sort of nagging at me. We have a settlement administrator here who's very experienced in these kinds of things, and he's intimately familiar with this case in particular. And he concluded that, well, you know what he concluded. Judge Breyer says his legal construction of the agreement is entitled to no deference, but then he doesn't cite a Ninth Circuit case for that. He doesn't even cite a federal case for that. He cites a New York State case for that. Why wouldn't, you know, in a sort of general, there's not really a Chevron deference case, but, you know, just kind of common sense, why wouldn't this guy's, why wouldn't Feinberg's conclusions be entitled to at least persuasive deference? I think for the exact same reason that when this Court typically reviews a district court contract interpretation, it doesn't grant deference to the district court no matter how familiar the district court is with the contract at issue. When the question is one of contract interpretation and a settlement agreement under Ninth Circuit law is clearly a contract, interpretations of that contract are reviewed de novo at each level by each reviewer. I gather there's no Ninth Circuit case or other federal case that would deal with a circumstance like this? I'm not aware of one offhand. There are certainly Ninth Circuit cases where the Ninth Circuit is reviewing a district court interpretation of a settlement agreement and does not give deference to the district court's interpretation. And by analogy, that same reasoning would apply to a district court reviewing a contract. One other example that I think illustrates clearly the bundling that was at issue, because I think the bundling is critical to understanding what happened here and why the Carnival all-inclusive packages were not, in fact, an airline ticket that was being sold by the airlines to the passengers, is to think about an omelet. I had an omelet this morning at my hotel for breakfast. I purchased that. The restaurant sold it to me. I was not purchasing separately eggs and cheese and peppers and ham. I purchased an omelet. And that's exactly what the cruise passengers purchased when they bought these all-inclusive packages, which under U.K. law are a defined entity with a whole set of regulations that govern how they're issued and what they consist of. The passengers purchased as a whole something that included airline tickets. It included fuel for the cruise ship. It included the labor costs that Carnival had to incur for its crew members who worked on the ship. And that package is the only thing that the cruise passengers purchased. I see you're down to two minutes. Would you like to reserve some? I would. Thank you very much. Thank you, Ms. Ellsworth. Before we get started with our appellees, have you folks decided how you're going to divvy up your time? Yes. Would you let us know how you're going to do that? Amanda Davidoff from Sullivan & Cromwell for British Airways. With the Court's leave, I'll present on behalf of both defendants, unless, of course, the Court has questions for Mr. Turner. Great. He's here from Simpson Thatcher for Virgin Atlantic. Thank you. May it please the Court, the issue on appeal is whether it was clear error for the district court, the court that oversaw the litigation below and granted final approval to the settlement agreements, to conclude as a matter of fact that British Airways and Virgin Atlantic sold the relevant tickets to Carnival's customers as required by the class definition in the settlement agreements. The district court found that no payments were made for tickets until the tickets were issued, and the district court found that no tickets were issued unless they were issued in the names of particular passengers. Importantly, the district court found that once the tickets were issued in the passengers' names, the tickets belonged to the passengers and the names could not be changed. Based on that factual record, it was not error, much less clear error for the court to find that under the agreements, the airlines sold the tickets to the passengers, with Carnival acting merely as a conduit. There are three points I'd like to cover, taken a little bit out of order from Carnival's presentation. First, the standard of review, which Your Honor raised. We do think there is an on-point decision from the Ninth Circuit that comments on the standard of review that should be applied. First of all, the district court's conclusion that the airlines sold the tickets to the passengers is a finding of fact. The parties don't dispute that sold means exchanged for value, and we heard that from Carnival as well, and that is the interpretation of the settlement agreement. It's not on review. The other finding that the district court made was a finding of fact that the airlines sold the tickets to Carnival's customers, and findings of fact are reviewed for clear error, as the court knows. Now, I understand Your Honor to be asking the question of, if you believe the settlement agreement was interpreted by the district court, and that that interpretation is on review, can we apply some level of deference either to the district court's findings or to Mr. Feinberg's findings? And the answer is yes. In the Congregation Aids Climb versus City of Los Angeles case that we cited in our brief, the court was reviewing an interpretation of a settlement agreement between the congregation and the City of Los Angeles over city building permit requirements. And the court concluded that the general notice provision in the settlement agreement meant a certain thing, and interpreted the settlement agreement in a certain way. And the Ninth Circuit was reviewing that decision and found that it would give due respect for the district court's superior perspective, based on the court's role both in overseeing the litigation and in entering the settlement agreement. The same circumstance applies here. Judge Breyer oversaw the litigation from the beginning. He granted final approval to the settlement agreements. And to the extent the court wishes to look to Mr. Feinberg's role, he is not only the settlement administrator who has considered the claims as they have come in, he also mediated the settlement agreement, and thus is quite familiar with the party's intent when they entered into the settlement agreements. In your view, could the passenger once take the ticket, decide to go to Miami or London, wherever they're going, never get on the ship, use the ticket, use the ticket to go home? In other words, take a land tour and tell Carnival they weren't interested in the rest of it? Your Honor, those tickets so, is your question does the passenger own the ticket? Well, I'm sure I'm going. Okay. The answer is yes. The way we, now, the counsel for Carnival is correct that the precise relationship between Carnival and its customers is not in the record. However, what the district court found, and this was supported by substantial evidence, was that when the airlines sold the tickets, they were sold from the airlines to Carnival's passengers. Carnival merely issued the ticket. And, you know, if the question is, you know, I, a passenger, go to Carnival and say, forget about the cruise, I don't want to go, yes, I own that ticket. And, potentially, Carnival has a claim against me. But that has no impact on the fact that I bought the ticket from British Airways or Virgin Atlantic. There is, at one point in the record, there's so many different contracts layered on top of one another here that it's kind of a Rubik's cube to figure out. But in the inclusive tourist contract, you do have this clause that says that Carnival is buying these as principal, not as agent. And as I understand it, the claim is, well, this has nothing to do with this case. This has to do with the ATOL regulations. Can you elaborate on that a little bit? What are these ATOL – tell me about these ATOL regulations. Tell me how they explain that language, which I think kind of cuts against your position. Well, Your Honor, that language – the answer I'd like to give to you is that agency is really – formal agency is really not the issue here. The District Court's decision that Carnival's customers were the purchasers was not based on any finding that there was a formal agency relationship between the airlines and Carnival. So, you know, the airlines' position here is not that we win because Carnival was our agent. The airlines' position here is that the tickets were sold from the airlines to the passengers because, based on the declarations and the contracts at issue, which the District Court reviewed, it found that the tickets were sold from the airlines to the passengers. And really, the critical finding there, I think, is, you know, some of the things that Counsel for Carnival mentioned, that the ticket was issued in the name of the passenger, but very critically, that Carnival really never owned those tickets, that the tickets went directly from the airlines to the passengers. So I don't think it's necessary for this Court to decide whether,  And I guess for the same reason you would say the Illinois brick rule has nothing to do with the case. Well, I would give two responses to Carnival's arguments about the Illinois brick rule. The first is that if the Court finds that there was some interpretation of the settlement agreements, as I said earlier, we really don't think this is a matter of interpretation. This was a factual finding. But if the Court finds there was some interpretation of the settlement agreements, we need to look to how we interpret settlement agreements. They're interpreted according to contract law. And if you interpret these agreements according to contract law, the word sold has its ordinary meaning, exchanged for value, and the facts in the record fully support that the tickets were exchanged for value from the airlines to the passengers. Some of those facts include the issuance in the name of the passengers, the fact that Carnival couldn't own the tickets and couldn't change passenger names, the fact that a separate contractual relationship formed at that time between the airlines and the passengers, and the fact that the passengers did pay the fuel surcharges. Suppose the counter thrust to that argument would be, well, they were settling an antitrust case here, so who was a purchaser and who wasn't, who had an antitrust injury and who didn't, obviously has to be the context in which one defines seller. What is your answer to that? Yeah. And I think the way, the point that you're making is the point that when a contract is entered into, the law that exists at the time it's entered into is somehow, becomes a part of the contract. And I think it's too far a leap to go from that principle to the conclusion that sold in these contracts means sold to a Sherman Act direct purchaser. That leap just can't be made for two reasons. The first is that this is the U.K. settlement class. Carnival claims to be a part of the U.K. settlement class. And under U.K. law, indirect purchasers can... It's settled more than the Sherman Act count. It's settled the entire complaint. Correct. And not only that, Your Honor, but there was a, the segregation between the U.K. settlement class and the U.S. settlement class reflects the distinct viability of the U.K. and U.S. claims for each class. That's clear from the settlement agreement, the settlement agreements because the settlement agreements provide for an extra payment to the U.S. settlement class explicitly due to the treble damages that were available under the Sherman Act. And the U.K. settlement class, which Carnival claims to be a member of, did not get that payment. Now, the second response to your question, Your Honor, is that the passengers would be Sherman Act direct purchasers here. So whether the court finds that the Sherman Act, that U.S. antitrust law is relevant here, the passengers here would be direct purchasers. It's just not the case that because somebody remits money, that makes them automatically the direct purchaser. In fact, travel agents, which we've talked about a bit, do that all the time. And Carnival conceded below that travel agents would not be class members. So remitting money just doesn't do it to make you the direct purchaser. I guess I should ask you the question I asked opposing counsel, and that is what is your view of the, whether the passengers who bought these packages are members of the class? Yes, Your Honor, they are. And in fact, it's not just 2,000 passengers that counsel for Carnival mentioned that are class members. As of September 30th, 2011, in the declaration submitted by the settlement administrator, nearly 3,000 passengers had submitted claims under the settlement agreements. And that was more than a year before the claims period ended. There's no more evidence in the record of how many passengers submitted claims between September 30th, 2011, and the end of the claims period, which was the end of 2012. But that number could be substantially higher. Under the settlement agreements, only one claim can be paid per ticket. That's explicit in the settlement agreements. And the necessary impact of Carnival's position is that they want the settlement administrator to claw back payments it has made to passengers in order for those payments to be transmitted to Carnival. Now that is contrary to the intent of these settlement agreements. The settlement agreements, within their text, which is sort of in the first instance, the way courts interpret the intent of a contract, is to look at the four corners of the agreement. Within the four corners of the agreement, the settlement agreements say, both in paragraph 10.1 and in the recitals, that the purpose of the agreement is to make refunds to settlement class members in amount of the portion of the fuel surcharge that they paid. And the recitals say the same thing. Our purpose here is to make refunds to class members. Refunds have to be made to people who paid the money in the first instance. Now, the court below found that the passengers, not Carnival, paid the fuel surcharges. We've heard a lot today of assertions that Carnival paid the fuel surcharges, or Carnival paid for the tickets. But again, that is remitting money, which travel agents do all the time. It's not paying for the tickets. And the district court found, and Mr. Feinberg found, that in fact it was Carnival's passengers that paid for those tickets. So, returning sort of a bit out of order to the reasons why it was not clear error for Judge Breyer to have concluded that the sale was made from the airlines to the passengers, he really focused on five key facts. The issuance of the tickets in the passengers' names, the fact that the remission of payment was only required after the ticket was issued, not before. That the contractual relationship formed between the airlines and the passengers at the time the ticket was issued. The fact that Carnival did not pay the fuel surcharge. And based on those facts, the court concluded that British Airways and Virgin sold the tickets to Carnival's customers. This was not clear error and is fully supported by the declarations and the contracts. The main response we heard to this today from Carnival was that it remitted money to British Airways and Virgin Atlantic and that it bundled the tickets with cruise packages. Now, the remission of money I believe we've covered. That's a standard travel agent function and it certainly doesn't indicate who the actual purchaser is. In terms of bundling the tickets with the cruise packages, that is really a marketing issue. That's how Carnival presented the tickets to its customers. You're getting this as part of a cruise package. But the underlying economics of the transaction, that's what the district judge was looking at, that's what Mr. Feinberg was looking at. And when they looked at those, they said the economics of the transaction are the ticket is issued to the passenger and the money is paid by the passengers. You're down to about 15 seconds if you'd like to wrap up. Okay. Well, for those reasons, Your Honor, we believe it's clear that the tickets were sold from the airlines to the passengers and the well-considered rulings of Judge Breyer and Mr. Feinberg should be affirmed. Thank you, Ms. Davidoff. Ms. Ellsworth, you had a couple of minutes left. Thank you, Your Honor. I'd just like to make a few points in response to my colleague's argument. The first relates to the standard of review. The Congregation case that she cited from the Ninth Circuit says exactly what we believe the standard of review is, which is that this Court reviews a district court's interpretation of a settlement agreement de novo, where the court has had extensive oversight of litigation and makes findings of fact. Those findings of fact may be reviewed with due respect for the district court's superior perspective. Quite frankly, this is not a case where there were findings of fact made. There were facts that were undisputed, related to when tickets were issued, whose name they were issued in, who paid money or who transferred money to the airlines, who had a payment obligation. And what the district court was asked to do was determine the legal consequences and the legal conclusion to be made from those facts, which is based on those undisputed facts, who was in fact the purchaser of the airline ticket. That was a legal conclusion and it should be reviewed de novo. It is a matter of contract interpretation. Judge Silverman, you asked how Carnival was different from a travel agent earlier, and I want to just expand on what I said to you in response, which is that these contracts that Carnival had with the airlines prevented it from selling airline tickets. The contract specifically stated in Section 2.1 and 6.1 of the British Airways contract and Section 5.1 of the Virgin Atlantic contract that Carnival could not sell airline tickets. What it could sell were packages, and that is very different from what a travel agent generally does. Travel agents also generally are not the party that is financially responsible for paying for the ticket. A travel agent is happy to take your credit card, charge your credit card for an airplane ticket, charge you a service fee or a commission for doing that, but the travel agent is not typically the person who is financially responsible to the airline. Carnival here is the only party that was financially responsible to the airline. And finally, the ATOL regulations that you mentioned, Judge Ripple, that provision of the contract refers to not being an agent for purposes of the ATOL regulations or otherwise. So it is a broader statement than just the ATOL regulations. Thank you. Ms. Davidoff, thank you as well. The case just argued is submitted. Good morning. Thank you.
judges: Ripple, Silverman, Gould